1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GREGORY ANDREW HALL,                    No. CIV S-05-1556-JAM-CMK-P

12                    Plaintiff,

13          vs.                              FINDINGS AND RECOMMENDATIONS

14   C. PLILER, et al.,

15                    Defendants.

16   _____/

17               Plaintiff, who is proceeding pro se, brings this civil rights action pursuant to 42

18   U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment (Doc.

19   72).[1]

20   / / /

21   / / /

22   / / /

23   _____

24          [1]      The remaining defendants are:  Pliler, Shrode, Ewing, Kelly, Clavere, Shoemaker,
     Baxter, Stiles, Rosario, Gold, Connor, Goughnour, Ugalino, Lord, Murphy, Rogel, Lt. Johnson,
25   Ranzany, Kimbrell, Peterson, Jaffe, Vance, Dr. Johnson, and Phillippi.  While Burruel is listed
     on defendants' motion as a moving party, he was terminated as a defendant to this action on
26   September 5, 2007.

                                                1

# I. BACKGROUND

## A.   Plaintiff's Allegations

This action proceeds on plaintiff's original complaint.  Plaintiff does not set forth any specific constitutional claims but, rather, outlines in mostly chronological order a series of factual allegations.  One paragraph of the complaint, however, appears to be a general statement of the nature of his claims.  Plaintiff states:

> I've never filed a lawsuit before[2] and I'm having a hard time trying to hold my <u>emotions</u> in check with regards to civil service employees premeditated and sophisticated malice and inhumane treatment they are subjecting me to, and I've only been convicted of a petty theft of two coffee jars with a total cost of $9.98 and these people (staff) are comitting [sic] a federal offense against me, by conspiracy under the color of law, and they have wage an attack knowingly with so many staff to seek the advantage to oppress my rights, confronting me with so many and numerous acts of misconduct that the writing of this civil rights complaint with details to me the criteria for the court to take action because I'm a victim of crimes pursuant to federal laws and state laws by prison staff.  I need "HELP" just to get this complaint filed right, so they (staff) don't get away with their crimes against me and the laws of the legal community or courts or laws of land. . . .(emphasis in original).

Plaintiff states that he arrived at California State Prison – Sacramento ("CSP-Sac.") on May 31, 2001.  According to plaintiff, upon his arrival be was mistreated by correctional officers.  Specifically, he claims that officer Andrade placed handcuffs on him too tight causing him to "cry[] out loud in pain for four hours."[3]  He also claims that officers Matthews, Turner, Villasenor, Ranzany, Ugalino, and Gonzales harassed him by denying him food and showers, and by "opening and closing my cell door continually" and "coming by my cell door whispering threats."[4]  He also alleges that these officers made "fraudulent and false

---

[2]     This statement is puzzling given that, earlier in the complaint, plaintiff lists the docket numbers of four previous actions filed in this court.

[3]     Andrade was not named as a defendant to this action.

[4]     Gonzales was dismissed on July 1, 2008, for failure to effect timely service. Matthews, Turner, and Villasenor were not named as defendants.

disciplinary allegations to make my time of imprisonment longer."  Plaintiff further asserts that these officers sent "prison gang members to my cell door trying to intimidate me and terrorize me by try to pick a fight with me. . . ."  He states that the officers acted "in retaliation for me filing inmate appeals on staff."

Plaintiff alleges that he sent a "formal complaint CDC 602 and cover letter" to the prison warden, C. Pliler, on June 3, 2001.  He states that this complaint was "obstructed from being process by D. Kimbrell. . . ."  Plaintiff then sent warden Pliler another grievance on June 6, 2001, outlining "inhumane mistreatment, conspiracy to deprive rights, threats of violence, racism" and other alleged staff misconduct.  Plaintiff claims that "C. Pliler, warden, did nothing whatsoever to alleviate or even address the life threatening serious condition of my confinement by any conventional means to address my concerns. . . ."

Next, plaintiff alleges that, on June 13, 2001, he was assigned to be housed in the general population "for the sole purpose to have me attacked."  He states that this assignment was made notwithstanding his having submitted "formal letters to the warden and [classification] committee members" regarding alleged staff misconduct and safety concerns.

Plaintiff states that "during this period of time" there was a lock-down of "more than half of the African American inmates on Facility C-Yard" due to "staff assaults on inmates or inmates and staff fights."  He states that he was "one of the few African Americans not on lock-down."  According to plaintiff, on June 18, 2001, correctional officer Matthews ordered him transferred to "the Block where the violent incidence with staff happen."  Plaintiff states that he refused to be transferred and that "the same day, some staff I did not know came to my cell saying 'you're going to get it!'"  Plaintiff adds: "That evening C/O Gonzales . . . alleged fraudulently that I was masturbating to get [me] removed and placed in administrative segregation."  He states that he was placed in a "holding cage" but was later released back to his

/ / /

/ / /

1   cell after "Sgt. Featherly determined that the allegations was false. . . ."[5]  Plaintiff claims that

2   ultimately he was placed in administrative segregation on June 20, 2001, because he submitted

3   an inmate grievance "to expose the prostitution racket by staff that flourish . . . by a code of

4   silence and secrecy."

5            According to plaintiff, between June 20, 2001, and July 25, 2001, officer Ranzany

6   "came to Facility-A ad. seg. and threaten me, making his finger like a gun and pointing it at me."

7   Plaintiff states that he sent "another complaint" to the warden the following day.  Plaintiff adds:

8   "All the time custody staff was manipulating to some degree mental health staff to provide them

9   a cover."  He alleges that mental health staff were "manipulated to write very fraudulent and false

10  mental health records documentations."  He states that he filed "a number of complaints" against

11  mental health personnel.  Plaintiff claims that, as warden, Pliler is responsible for his custody yet

12  "allowed false and fraudulent documents to be produce by mental health staff against my right to

13  refuse, denying me equal protection and due process intentionally."  He states that he submitted

14  an inmate grievance on June 2, 2001, documenting his claims related to mental health

15  documents.

16           Plaintiff claims that, on June 6, 2001, a prison psychiatrist, Dr. Johnson, "wrote a

17  false and fraudulent record that I was hostile, angry, belligerent."  Plaintiff states that he "has

18  only said very kindly that I did not want to talk to him and I have a right to refuse according to

19  CDC rules and regulations."  He states that he wrote a letter to the chief psychiatrist, Dr.

20  Peterson, regarding the problem but that Dr. Peterson "used this as an opportunity to attack me"

21  and responded by saying that plaintiff is having difficulty organizing his thoughts.  According to

22  plaintiff, on June 13, 2001, a prison psychologist, Dr. Shoemaker, "initially wrote somewhat the

23  truth of what took place" but that the doctor "would later go and back-date and add documents

24  that I displayed paranoid thoughts. . . ." (emphasis in original).  Plaintiff states that he submitted

25  ─────────────────

26           [5]        Featherly was not named as a defendant.

4

his "third complaint" regarding these issues on June 20, 2001.

Next, plaintiff states that, on June 27, 2001, Dr. Clavere, a prison psychologist, and G. Phillippi, a licensed clinical social worker, "sign and falsified fraudulent documents to assign me to a mental health enhance Outpatient Program (EOP)." (emphasis in original). He claims that "[t]his was all a cover-up . . . because of me exercising my rights to complaint [sic] about the corruption, violence, and prostitution racket by CDC civil service employees. . . ." He adds that Dr. Kelly, the chief prison psychologist, was an "active participant." Plaintiff states that he never demonstrated any behavior to warrant an EOP placement.

Continuing his allegations relating to mental health care, plaintiff claims that, on July 4, 2001, he filed a "complaint" with the Sacramento County Superior Court "regarding the criminal activities at CSP-Sacramento by mental health staff and custody staff." He adds that, though the "complaint," which was filed as a petition for writ of habeas corpus, was denied, on July 10, 2001, he was removed from the "EOP fraudulent assignment but not the unit or mental health." According to plaintiff, on July 19, 2001, Dr. Baxter, another prison psychologist, betrayed his trust by falsely reporting that plaintiff suffered from obsessive compulsive disorder and that he was manic depressive. Plaintiff states that, on July 29, 2001, he conducted an "Olson" review of his mental health file where he requested copies of documents. He states that the documents he received were back-dated and fraudulent.

Plaintiff states that, on August 8, 2001, he "finally manage to get a CSP-Sacramento investigation interview." He claims that, after this interview, officer Rogel said "Now we gone put a knot on your head," and officer Lord said "We gone get your ass when you go to GP." He alleges that, on August 24, 2001, he was transferred to a facility in Los Angeles on "out-to-court" status where he was attacked by another inmate.

/ / /

/ / /

/ / /

1     Next, plaintiff alleges that, on October 14, 2001, he was denied a shower by

2  officer Smith.[6]  He also claims that, on December 15, 2001, officer Smith "put foreign particles

3  in my food that would choke me."  He adds that officer Smith "made threats and harass me

4  between these two dates."  Plaintiff states that, on October 24, 2001, officer Shrode told plaintiff

5  "We'll get you, you are by yourself" and, while the officer was walking away, he added: "We

6  gone kill that bastard."  According to plaintiff, on November 2, 2001, officers Chastain and Mini

7  "sign fraudulent and false documents to sent me to Facility B, by deliberate indifference and

8  totally a reckless disregards for my health and safety to set the stage for me to be assaulted or

9  murdered, because I went on tape about staff and inmates attempts and threats on my life. . . ."[7]

10  Plaintiff states that he received "another fraudulent and false reviews of guilty findings for not

11  following a order to go to A-Yard on Nov. 28, 2001."[8]  He alleges that, on January 31, 2002,

12  associate warden Chastain and officers Martel and Mini "again with deliberate indifference and

13  totally reckless disregards for my health and safety sign fraudulent documentations and record to

14  remove me from Ad. Seg. and send me back to C-Yard for the sole purpose to bring about my

15  murder or assault in retaliation for all my writing and complaints on staff misconduct."  He states

16  that "[e]ven Capt. Mandeville provided a false . . . report that does not address, nor cover the true

17  risk, especially threats by Sgt. Rogel and Sgt. Murphy and controlled inmate(s) element."[9]

18  / / /

19

20     [6]     Smith was dismissed on July 1, 2008, for failure to effect timely service.

21     [7]     There is no "Mini" listed in the complaint as a defendant.  Minyard was named as
a defendant but was dismissed on July 1, 2008, for failure to state a claim.  Chastain was not
22  named as a defendant.

23     [8]     As discussed below, defendants' undisputed evidence shows that plaintiff was
charged with a rules violation on November 10, 2001, for failing to return to the general
24  population yard upon being ordered to do so.  Given the reference to November 28, 2001, it
appears this allegation relates to a subsequent inmate appeal regarding the November 10, 2001,
25  charge.

26     [9]     Mandeville was not named as a defendant.

1    Next, plaintiff states that, on December 2, 2001, "the same C/O Gonzales that I

2  wrote a complaint about making false allegations of masturbation to Sgt. Featherly on June 19,

3  2001, . . . found her way from C-Yard to A-Yard and to my Ad. Seg. unit by the support of Lt.

4  Gold and other staff, and wrote a fraudulent allegation of masturbation to turn my lock-up to take

5  time from me."  Plaintiff claims that officer Gold denied him the opportunity to call a witness at

6  a rules violation hearing resulting from the December 2, 2001, rules violation.  He adds that

7  associate warden Goughnour "upheld the due process violation and fraudulent report."

8    Turning back to his claims relating to documents in his mental health file, plaintiff

9  states that, on December 10, 2001, "P. Vancor, heath care analyst, provided my first level review,

10  and gave me a false disposition to my mental health appeal, protecting staff and denied the

11  appeal. . . ."[10]  He states that he sent a "third or fourth complaint to the medical board of

12  California."  According to plaintiff, on January 5, 2002, "Dr. M. Jaffe, chief psychiatrist, did the

13  same thing at the second level review as P. Vancor did at the first level of review. . . ."  Plaintiff

14  states that, on January 15, 2002, Dr. Ewing, a staff psychiatrist, "wrote a fraudulent assessment

15  that I had antisocial personality disorder."  Plaintiff adds that he continued to refuse mental

16  health services and that, on January 23, 2002, Dr. Judy Ringerson, an outside psychologist,

17  removed plaintiff's name from the mental health program.  He claims that "[a]fter the first hour

18  of talking to me she said she's removing me from the program."

19    Next, plaintiff returns to his allegations regarding his being ordered to return to

20  the general population despite risks to his safety.  He claims that, on January 31, 2002, officer

21  May ordered him to return to the general population and threatened him with a rules violation

22  charge if he did not comply.[11]  Plaintiff did not comply and officer May charged him with a rules

23  violation.  Plaintiff states that this rules violation was "classified" by officer Schroeder, he was

24

25    [10]    Vancor was not named as a defendant.

26    [11]    May was not named as a defendant.

7

found guilty by officer Johnson, and the finding was upheld by officers Connor and associate

warden Goughnour.[12]  Plaintiff states that he was placed in administrative segregation as a result

of this violation and that such placement was in violation of his due process rights because he

"never received a CDC-114 lock-up order."  He states that he was in administrative segregation

from January 31, 2002, through March 12, 2002, without an appropriate lock-up order.

Adding to his claims about grievances filed concerning mental health issues,

plaintiff alleges that, on February 2, 2002, officer Vancor and Dr. Whelan, a prison psychologist,

"denied another appeal I had on all mental health staff in my case."[13]  Plaintiff adds the following

regarding his retaliation claims:

> On 2-28-02, the retaliation continued for trying to exercise my rights to
> utilize the inmate appeal system, guards terrorized me, c/o Minyard said
> "Hall, think, we'll get you!"  C/O Minyard was as serious as a heart attack.

He alleges that, on March 3, 2002, officer Ash was "again hitting his hands like he was stabbing

somebody while looking at me with mad expression," and that, "[o]n or about 3-24-02, C/O

Minyard said 'I'll have the Mexicans stab you!'"[14]

The remainder of plaintiff's allegations, which cover the period from March 18,

2002, through July 15, 2002, do not relate to correctional staff who were named as defendants in

the complaint.

These allegations appear to give rise to, at best, the following claims: (1) violation

of the Eighth Amendment based on denial of food and showers; (2) violation of the Eighth

Amendment based on returning plaintiff to the general population in disregard for plaintiff's

safety; (3) violation of the Eighth Amendment based on handcuffs being put on too tightly;

(4) violations of due process relating to disciplinary proceedings; and (5) retaliation.  Plaintiff

---

[12]     Schroeder was not named as a defendant.

[13]     Whelan was dismissed on July 1, 2008, for failure to state a claim.

[14]     Ash was not named as a defendant.

8

also alleges numerous facts regarding "fraudulent and false" documents placed in his mental health file which resulted in improper EOP and/or CCCMS classification and unwanted mental health treatment. The court finds that such allegations do not state any cognizable claim under § 1983 because plaintiff does not have any right to a particular classification. See Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976); Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998); Duffy v. Riveland, 98 F.3d 447, 457 (9th Cir. 1996); Hernandez v. Johnston, 833 F.3d 1316, 1318 (9th Cir. 1987).

Plaintiff also does not state any cognizable claim based on his generalized allegations of a conspiracy. Such allegations are conclusory and vague in that plaintiff has not alleged any particular agreement among any particular defendants to violate his constitutional rights. Plaintiff uses the word "conspiracy" in passing throughout the complaint, but does not offer any factual allegations to establish that defendants conspired to violate his rights. Plaintiff's conclusory allegation of a conspiracy is insufficient. See Price v. Hawai'i, 939 F.3d 702, 708-09 (9th Cir. 1991).

**B.    The Parties' Evidence**

Defendants admit the allegations in the complaint that they were employed in the following capacities during the times relevant to this case:

| | |
|---|---|
| Prison Administrators | Pliler, Rosario, Stiles, and Goughnour |
| Facility Captains | Vance and Connor |
| Correctional Lieutenants | Gold and Kimbrell[15] |
| Correctional Sergeants | Rogel and Murphy |
| Correctional Officers | Ranzany, Ugalino, Shrode, and Lord |
| Mental Health Staff | Ewing, Kelly, Clavere, Shoemaker, Baxter, Dr. Johnson, Peterson, Jaffe, and Phillippi |

---

[15]    The complaint indicates that defendant "Lt. Johnson" is also a correctional lieutenant. However, he is not listed as such in defendants' statement of undisputed facts.

Defendants outline facts in three categories – (1) "Hall's Incarceration at CSP-Sac."; (2) "Hall's Mental health Treatment at CSP-Sac."; and (3) "Administrative Grievances" – as follows:

Incarceration at CSP-Sac.

1.    On June 15, 2001, officer Villasenor charged plaintiff with a rules violation for disobeying two orders to return to his cell and then becoming argumentative with staff;

2.    On June 20, 2001, plaintiff reported to staff that his safety might be in jeopardy if he remained in the C-Facility General Population;

3.    In response to this complaint, plaintiff was placed in administrative segregation for his safety and an investigation was ordered;

4.    A hearing on plaintiff's rules violation was held on July 11, 2001, and plaintiff was found guilty;[16]

5.    On July 12, 2002, plaintiff was charged with another rules violation for refusing to relinquish his food tray when ordered to do so;

6.    A disciplinary hearing on this rules violation was held on August 8, 2001, and plaintiff was found guilty;

7.    On August 15, 2001, plaintiff was interviewed by an investigating officer in relation to plaintiff's report of June 20, 2001;

8.    The investigating officer reported the following:

On August 15, 2001, I conducted an audio/video interview with HALL. He stated he arrived via special transport on May 31, 2001, from California State Prison – Los Angeles (LAC). HALL conveyed since his arrival, he has realized staff at SAC are involved in corruption, organized crime, and a plot to murder him. HALL came to this conclusion based on his prior reports of staff misconduct while housed at other institutions, and he believes all the institutions are working together as a tag team against him.

---

[16]    Defendants cite "DX A-1, p. 7" in support of this statement. There is no "DX A-1" submitted as part of defendants' motion for summary judgment. Presumably, defendants mean to refer the court to Exhibit A to their separate statement of undisputed facts filed in support of summary judgment. Page 7 of Exhibit A does not relate to a July 11, 2001, hearing. Rather, page 7 is a document reporting plaintiff's classification history. The July 11, 2001, hearing is referenced in a document at Exhibit A, page 33, which is a copy of the June 15, 2001, rules violation report.

HALL further stated when staff spoke to him, they pointed their index finger towards him with their thumb upward. HALL interpreted this as a threat because the hand gesture resembled a gun.  In addition, staff would tell him to go to bed, and he felt very disrespected because he is 42 years old.

* * *

HALL was only assigned to B-Block approximately one month before he was placed in Ad/Seg.  While HALL was housed in the block, Officer Rafferty escorted a Psychologist to HALL's cell on several occasions because of his bizarre behavior.  HALL was uncooperative and would yell at the Psychologist stating he would sue everyone.  According to Officer Rafferty, the other inmates would not socialize with HALL because he was very loud and acted very bizarre.

* * *

A subsequent review of HALL's central file indicates he is non-affiliated with a history of non-complying behavior. HALL's disciplinary history overview consists of a 5-month Security Housing Unit (SHU) term for Threat of Force and Violence to Non-Inmate, Disrespect Towards Staff, Indecent Exposure/Masturbation (3 RVR's noted), Assault on Non-Inmate w/o SBI – 12-month SHU term served, Disobeying Orders, and Refusing to Relinquish a Food Tray.  According to his CDC 812, there are no listed enemies or confidential information.

HALL may have mental health issues.  As HALL stated during the interview, he admits things may mean something different, but it is his interpretation of situations that causes him to react.  It is my recommendation that Mental Health staff continue to closely monitor HALL's behavior, and he is referred to Institutional Classification Committee (ICC) for appropriate housing consideration and program evaluation.

9.  Plaintiff was cleared for release from administrative segregation and scheduled to be returned to the general population B-Facility on November 8, 2001, with a notation that plaintiff had no known enemies housed in B-Facility;

10.  On November 10, 2001, plaintiff was charged with a rules violation when he refused an order by a correctional officer to pack his property and prepare to move back to the general population;

///

11

11. On November 15, 2001, the classification committee decided to retain plaintiff in administrative segregation pending the outcome of the November 10, 2001, rules violation;

12. A hearing on the rules violation was held on December 12, 2001, and plaintiff was found guilty; and

13. At the December 12, 2001, disciplinary hearing, plaintiff presented a hand-written document which alleged harassment, discrimination, threats, "inhumane treatment," and violence and a list of correctional staff which included the defendants.

Mental Health Treatment

1. Plaintiff's medical file indicates that he was first seen by mental health staff at CSP-Sac. on June 6, 2001, when Dr. Johnson saw plaintiff at his cell door;

2. Dr. Johnson noted in progress notes that plaintiff has been diagnosed with schizophrenia but had not been taking his medication;

3. Plaintiff refused to speak with Dr. Johnson and any attempt by the doctor to converse with plaintiff caused agitation;

4. The doctor noted that plaintiff's mood was hostile, angry, suspicious, and belligerent, and he recommended that plaintiff remain at the "CCCMS" level of care;

5. The same day, plaintiff wrote a letter to the chief medical officer complaining of staff "organized crime and corruption";

6. Dr. Peterson responded to plaintiff's letter on June 11, 2001, asking plaintiff to provide specific instances of alleged corruption;

7. In his June 11, 2001, memorandum, Dr. Peterson stated that plaintiff's June 6, 2001, letter evidenced that plaintiff was having difficulty organizing his thoughts and, therefore, he forwarded plaintiff's letter to the prison mental health facility for follow-up;

8. Following Dr. Peterson's referral, on June 13, 2001, plaintiff was seen at his cell by Dr. Shoemaker whose notes reflect that plaintiff stated "I don't want to have a conversation" and he called the doctor a "racist, punk-ass bitch";

9. Dr. Shoemaker referred plaintiff to be seen by the prison psychiatrist based on: (a) plaintiff's refusal to attend a classification hearing; (b) plaintiff's refusal to speak with Dr. Johnson on June 6, 2001; (c) plaintiff's refusal to speak with her on June 13, 2001; and (d) plaintiff's refusal to take prescribed medications;

/ / /

10. Dr. Shoemaker visited plaintiff at his cell again the following day and plaintiff stated repeatedly that he did not want to talk to her;

11. Dr. Shoemaker recommended that plaintiff's care level be increased to Enhanced Outpatient ("EOP");

12. Plaintiff's care level was changed to EOP on or about June 15, 2001, and plaintiff was monitored by mental health staff;

13. On July 11, 2001, Dr. Clavere reported in plaintiff's progress notes that he was not benefitting from EOP placement;

14. Dr. Baxter met with plaintiff on July 19, 2001, and reported that plaintiff told him that he had been "fraudulently" placed in EOP;

15. Dr. Baxter monitored plaintiff's care, and met with him throughout August 2001;

16. On October 12, 2001, plaintiff was seen cell-side by Dr. Ewing;

17. Plaintiff refused to communicate with Dr. Ewing and the doctor diagnosed psychosis not otherwise specified based on a review of plaintiff's medical file;

18. Dr. Ewing noted that plaintiff continued to refuse to take medications;

19. Dr. Cho visited plaintiff cell-side on November 8, 2001, at the request of the classification committee and noted that, while plaintiff was hostile and refused treatment, he was clean and did not demonstrate any suicidal ideation;

20. Dr. Cho opined that plaintiff did not require the EOP level of care;

21. Dr. Gaerlan tried to speak with plaintiff at his cell on two occasions – December 4, 2001, and December 14, 2001 – and on the second attempt plaintiff stated:

> You're not African-American, and you have Western European thinking.  I told you I don't want to talk to you. Fuck you.  If you don't want to be included in my lawsuit, get out of here.

22. Plaintiff met with Drs. Moazom and Ringerson on January 23, 2002, for an assessment of his mental health needs and to address plaintiff's grievances;

23. Plaintiff continued to object to his diagnoses and EOP assignment;

24. The doctors noted that plaintiff had been free of medications for some time and concluded that plaintiff did not meet the criteria for the "CCCMS" level of care;

25.    Plaintiff's mental health care classification was changed that day to remove the "CCCMS" designation;

26.    On March 26, 2002, plaintiff was seen by Dr. Jackson after officers reported that plaintiff was yelling and upset that officers were trying to cause him harm, and that plaintiff appeared paranoid and fearful when they tried to enter his cell;

27.    Dr. Jackson noted that plaintiff's thoughts were disorganized to the point that the doctor couldn't understand what plaintiff was saying;

28.    Dr. Jackson opined that plaintiff was a risk for assaultive behavior based on his mania and delusions; and

29.    On April 3, 2002, custody staff reported to Dr. Jackson that plaintiff had been in the shower yelling "God will kill us all" and, when Dr. Jackson reported to plaintiff's cell, plaintiff refused to answer any questions about his mental status.

Grievances

1.    While housed at CSP-Sac., plaintiff filed 30 inmate grievances, the first of which was filed on June 25, 2001;[17]

2.    On August 16, 2001, plaintiff filed an inmate grievance claiming that documents in his mental health file were fraudulent;[18]

3.    This grievance was denied at the first level based on lack of evidence that staff had falsified documents;[19]

/ / /

/ / /

---

[17]    Defendants cite "DX A-1, p. 67-60" in support of this statement.  At Exhibit A, pages 67-68, defendants provide what appears to be a log of plaintiff's inmate grievances filed while he was incarcerated at CSP-Sac.  This documents lists 29 grievances and staff complaints.

[18]    Defendants cite "DX A-1, p. 71" in support of this statement of fact.  At Exhibit A, page 71, defendants provide a copy of a March 24, 2002, inmate grievance which does not relate to allegedly falsified mental health documents.  A December 6, 2001, grievance (No. 01-02752) concerning "fraudulent mental health documents" is located at Exhibit A, page 79.  The court cannot locate an August 16, 2001, grievance anywhere in defendants' evidence.

[19]    Defendants cite "DX A-1, p. 76-77" in support of this statement.  Presumably this refers to pages 76 and 77 of Exhibit A.  Page 76 of Exhibit A, however, is the second page of an April 11, 2002, memo, and page 77 is an April 12, 2002, memo.  Page 83 of Exhibit A contains a February 8, 2002, "First Level Appeal Response" to the grievance assigned No. 01-02752.

14

4.      This grievance was also denied at the second level based on a finding that the grievance had been adequately addressed at the first level;[20]

5.      On December 6, 2001, plaintiff filed a second grievance alleging that prison doctors were involved in a white collar crime network and that they had falsified mental health documents;[21]

6.      This grievance was denied at the first level with a notation that an inquiry had been performed and no evidence of wrongdoing was found;[22]

7.      This grievance was denied at the second level based on insufficient evidence;[23]

8.      On March 24, 2002, plaintiff filed a grievance alleging that correctional officers made threats against him, were involved in a conspiracy to deprive him of constitutional rights, and retaliated against him;[24] and

9.      This grievance was submitted for investigation.[25]

Other than his verified complaint and signed opposition memorandum, which could be construed as a declaration, plaintiff does not present any evidence in support of his claims.

---

[20]      Defendants cite "DX A-1, pp. 79-90" in support of this statement. Page 79 of Exhibit A, however, is plaintiff's December 6, 2001, grievance and Exhibit A consists of only 86 numbered pages.

[21]      Defendants cite "DX A-1, p. 90." There is no page 90 to Exhibit A.  The December 6, 2001, grievance is located at page 79.

[22]      Defendants cite "DX A-1, p. 94. There is no page 94 to Exhibit A.  The first level appeal response to the December 6, 2001, grievance is located at page 83 of Exhibit A.

[23]      Defendants cite "DX A-1, p. 95-96. There are no pages 95 and 96 to Exhibit A. The second level appeal response to the December 6, 2001, grievance is located at Exhibit A, pages 84-85.

[24]      Defendants cite "DX A-1, p. 82." Page 82 of Exhibit A, however, is a document entitled "Rights and Responsibility Statement" signed by plaintiff on December 6, 2001, and defendant Kimbrell on December 26, 2001.  The March 24, 2002, grievance (No. 02-00869) is located at pages 71-72 of Exhibit A.

[25]      Defendants cite DX A-1, p. 86-89." Page 89 of Exhibit A, however, is the director's level response to plaintiff's December 6, 2001, grievance. An April 8, 2002, document signed by defendant Rosario indicates that the March 24, 2002, appeal was forwarded to the Investigative Services Unit.  See Ex. A, p. 74.  On April 11, 2008, defendant Pliler sent plaintiff a memo indicating that grievance had been partially granted to the extent it had been referred for investigation.  See Ex. A, pp. 75-76.  In June 2002 a director's level decision was issued denying the grievance.  See Ex. A, p. 78.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

3   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

4   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

5   for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

6          In the endeavor to establish the existence of a factual dispute, the opposing party

7   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

8   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

9   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

10  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

11  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

12  committee's note on 1963 amendments).

13         In resolving the summary judgment motion, the court examines the pleadings,

14  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

15  any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

16  Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

17  before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

18  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

19  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

20  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

21  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

22  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

23  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

24  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

25  / / /

26  / / /

17

### III.  DISCUSSION

Defendants argue that they are entitled to summary judgment because: (1) all of plaintiff's claims are barred by the applicable statue of limitations; (2) plaintiff lacks standing because he has not alleged that he suffered any injury; (3) plaintiff has no right to any particular grievance process; (4) any adverse action taken by defendants related to a legitimate penological interest and, therefore, was not retaliatory; (5) plaintiff does not have any liberty interest in not being confined in administrative segregation and, in any event, plaintiff received all the process he was due; and (6) plaintiff has not offered any evidence to establish a conspiracy.[26]

The court begins by noting that, of the possible claims suggested by plaintiff's factual allegations, some are not actually present in this case.   There is no claim before the court based on plaintiff's allegations that correctional officer Andrade put handcuffs on too tightly because plaintiff did not name Andrade as a defendant.  As to plaintiff's allegation that he was returned to the general population in disregard for his safety, plaintiff states that this was done by the "classification committee" on June 13, 2001, and by officer May on January 31, 2002. Plaintiff does not identify who the members of the classification committee were and defendants' undisputed evidence shows that the decision to return plaintiff to the general population was made by K.M Chastain, D.I. Willey, and M. Cho, none of whom were named in the complaint. Similarly, May was not named as a defendant.

/ / /

/ / /

/ / /

---

[26]     There is no need to address defendants' due process argument concerning plaintiff's continued confinement in administrative segregation.  That argument challenges plaintiff's claim that officer Burruel retained him in administrative segregation without providing plaintiff an opportunity to be heard.  As indicated above, Burruel is no longer a party to this action, having been dismissed on September 5, 2007.
      Nor is there a need to address defendants' conspiracy argument because, as discussed above, the court finds that the complaint fails to state a conspiracy claim.

A.  **Statute of Limitations**

Defendants argue that all of plaintiff's claims are time-barred.  For claims brought under 42 U.S.C. § 1983, the applicable statute of limitations is California's statute of limitations for personal injury actions.  See Wallace v. Kato, 127 S.Ct. 1091, 1094-95 (2006); Wilson v. Garcia, 471 U.S. 261, 280 (1985); Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 (9th Cir. 1988).  State tolling statutes also apply to § 1983 actions.  See Elliott v. City of Union City, 25 F.3d 800, 802 (citing Hardin v. Straub, 490 U.S. 536, 543-44 (1998)).

Before January 1, 2003, the statute of limitations for personal injury actions was one year.  See Cal. Code Civ. Proc. § 340(3); see also Fink v. Shedler, 192 F.3d 911, 914 (9th Cir. 1999) (citing Elliott, 25 F.3d at 802, and applying the one-year limitation period specified in § 340(3)).  The personal injury statute of limitation was extended by passage of California Code of Civil Procedure § 335.1 to two years, effective January 1, 2003.  See Canatella v. Van De Kamp, 486 F.3d 1128, 1132 (9th Cir. 2007) (citing Cal. Code Civ. Proc. § 335.1).  The extension of this statute of limitations does not apply retroactively to claims which were already barred under the one-year limitation period specified in § 340(3), plus any statutory tolling, as of the effective date of January 1, 2003.  See Maldonado v. Harris, 370 F.3d 945, 955 (9th Cir. 2004) (citing Douglas Aircraft v. Cranston, 58 Cal.2d 462 (1962)).  However, the extended statute of limitations period provided for in § 335.1 is applicable to claims which are not yet barred.  See Lamke v. Sunstate Equip. Co., LLC, 387 F. Supp. 2d 1044, 1051-52 (N.D. Cal. 2004) (citing Douglas, 58 Cal.2d at 465).

At the time Elliott was decided – 1994 – California Code of Civil Procedure § 352(a)(3) provided tolling of the statute of limitations when the plaintiff is "[i]mprisoned on a criminal charge, or in execution under sentence of a criminal court for a term of less than for life."  That tolling, however, only applies if the disability of incarceration existed at the time the claim accrued.  See Elliott, 25 F.3d at 802 (citing Cal. Code Civ. Proc. § 357).  Pre-conviction incarceration qualifies.  See id.  By the time Fink was decided – 1999 – the California tolling

1    provision for the disability of incarceration had been amended.  Specifically, California Code of

2    Civil Procedure § 352.1, which became effective January 1, 1995,  provides prisoners with only

3    two years of tolling.  See Fink, 192 F.3d at 914.  Prior to the effective date of § 352.1, prisoners

4    enjoyed tolling for the entire time of sentences less than life.  See id.  The Ninth Circuit in Fink

5    concluded that § 352.1 applies retroactively.  See id. at 915.  Thus, for § 1983 claims which

6    accrued before January 1, 1995, the running of the statute of limitations is tolled for two years, or

7    until January 1, 1997, whichever is later.  See Fink, 192 F.3d at 916.

8          The applicable statute of limitations is further tolled while a prisoner completes

9    the exhaustion process mandated by the Prison Litigation Reform Act ("PLRA").  See Brown v.

10    Valoff, 422 F.3d 926, 942-43 (9th Cir. 2005).  In Brown, the Ninth Circuit observed that "a

11    prisoner may *not* proceed to federal court while exhausting administrative remedies," and that

12    "awaiting the completion of a staff misconduct investigation could, absent some adjustment,

13    endanger the prisoner's ability to file his court complaint within the limitations period."  Id. at

14    942.  The court added:

15          We also note that, again like all the other circuits that have
            considered the question, "we refuse to interpret the PLRA so narrowly as

16          to . . . permit [prison officials] to exploit the exhaustion requirement
            through indefinite delay in responding to grievances."

17

18          Id. at 943 n.18 (quoting Lewis v. Washington, 300 F.3d 829, 833 (7th Cir.
            2002), Jernigan v. Stuchell, 304 F.3d 1030 (10th Cir. 2002), Miller v.
            Norris, 247 F.3d 736, 740 (8th Cir. 2001), and Underwood v. Wilson, 151

19          F.3d 292, 295 (5th Cir. 1998) (per curiam)).

20          In cases where the plaintiff alleges ongoing violations, claims outside the

21    limitations period which relate to claims within the limitations period may nonetheless be

22    actionable under the continuing violation doctrine.  In an employment discrimination case, the

23    Supreme Court stated that "discrete discriminatory acts are not actionable if time barred, even

24    when they are related to acts alleged in timely filed charges."  National Railroad Passenger Corp.

25    v. Morgan, 536 U.S. 101, 113 (2002).  However, where the plaintiff asserts claims resulting from

26    an alleged ongoing policy of discrimination, the continuing violation doctrine applies.  See

1   Gutowsky v. County of Placer, 108 F.3d 256, 259-60 (9th Cir. 1997).  In Gutowsky, the plaintiff

2   had alleged "that the widespread policy and practices of discrimination of which she complains

3   continued every day of her employment, including days that fall within the limitation period."  Id.

4   at 260.  Thus, there needs to be an allegation that the specific acts alleged are instances of some

5   broader policy.  See id.; see also Cholla Ready Mix Co. v. Civish, 382 F.3d 969, 974-5 (9th Cir.

6   2004) (citing Morgan, 536 U.S. at 113-14).

7           The parties agree that the relevant time period of plaintiff's allegations is from

8   May 31, 2001, through July 8, 2002.  Defendants argue that the one-year statute of limitations

9   applies to this case and that, with tolling, the complaint was due by July 8, 2005.  Defendants

10  appear to give plaintiff the benefit of the doubt as to when his claims accrued and assume that

11  they all accrued at the latest possible date – July 8, 2002.  Defendants conclude that, because the

12  complaint was filed on August 4, 2005, it is untimely.[27]  Given that plaintiff's claims accrued

13  after January 1, 1995, the court agrees with defendants that plaintiff is entitled to at most two

14  years tolling under California law due to his incarceration.

15          The analysis, however, is not as simple as defendants would like.  First,

16  defendants fail to account for the time plaintiff was exhausting his administrative remedies.

17  Assuming that the one-year limitations period applies to plaintiff's case, plus two years tolling

18  due to incarceration, but no tolling for exhaustion, plaintiff's claims would be late by somewhere

19  between 14 months and one month, depending on when the claim accrued.  Defendants do not

20

21          [27]     In Houston v. Lack, 487 U.S. 266 (1988), the Supreme Court held that a pro se
    prisoner's notice of appeal is deemed "filed" at the moment he delivers it to prison officials for
22  mailing to the court.  The so-called "prison mailbox rule" has been extended to apply to other
    legal documents submitted to the court by prisoners.  See e.g. Stillman v. LaMarque, 319 F.3d
23  1199, 1201 (9th Cir. 2003) (applying rule to prisoner's habeas corpus petition); see also Huizar v.
    Carey, 273 F.3d 1220, 1223 (9th Cir. 2001) (discussing rule in context of "prisoner who delivers
24  a document to prison authorities"); Lott v. Mueller, 304 F.3d 918, 921 (9th Cir. 2002) (stating
    rule in terms of any "legal document" submitted by a pro se prisoner).  Thus, the actual filing
25  date of plaintiff's civil rights complaint is somewhat sooner, but no sooner than July 31, 2005 –
    the date of his proof of service and the earliest he could have delivered the complaint to prison
26  officials for mailing to the court.

1  provide the court with evidence sufficient to allow the court to determine how long plaintiff was

2  engaged in the exhaustion process.[28]  If, for example, it took plaintiff more than 14 months to go

3  through the various levels of the prison grievance system, all his claims would be timely.

4          Second, defendants are incorrect that the one-year statute of limitations applies in

5  this case.  For the sake of simplicity, the court will ignore for the moment any tolling plaintiff

6  would receive for the time he was exhausting his administrative remedies under the PLRA.

7  Under a one-year statute, plus two years tolling, plaintiff's claims would be time-barred between

8  May 31, 2004, and July 8, 2005.  However, effective January 1, 2003, California law changed to

9  provide a two-year limitations period.  This change applies to claims which were not barred

10 under the one-year limitations period as of the effective date of the two-year limitations period.

11 None of plaintiff's claims would have been barred as of January 1, 2003, under the one-year

12 statute of limitations.  Thus, he is entitled to the two-year statute of limitations for all his claims.

13 Under a two-year limitations period, plus two years of tolling, plaintiff's claims would be time-

14 barred between May 31, 2005, and July 8, 2006.  The complaint in this case was filed on August

15 4, 2005 (or July 31, 2005, under the mailbox rule).  Thus, absent tolling for exhaustion, only

16 those claims which actually accrued between May 31, 2005, and the filing date would be time-

17 barred.  Factoring back in tolling for PLRA exhaustion, the court cannot determine whether any

18 claims are necessarily time-barred because, as discussed above, defendants do not provide

19 sufficient evidence as to the time plaintiff was engaged in the exhaustion process.

20          For these reasons, the court finds that defendants have not met their burden of

21 establishing, as a matter of law, that any of plaintiff's claims are time-barred.

22

---

23     [28]     As detailed above in section I.B., defendants' evidence regarding plaintiff's
   grievances is incomplete.  For example, defendants state that plaintiff filed a grievance in August
24 2001, but do not provide any evidence of such a grievance.  In addition, defendants' exhibits
   reflect that plaintiff filed 29 grievances and staff complaints while housed at CSP-Sac., but only
25 provided detailed evidence as to two of them.  The court has no way of knowing the subjects of
   the remaining grievances such that it can determine whether they were submitted as part of the
26 exhaustion process relating to the claims raised in this case.

1          **B        Standing**

2          Defendants argue that they are entitled to judgment as a matter of law because

3   plaintiff lacks standing.  Specifically, defendants assert:

4               Plaintiff has not alleged that he suffered a particularized and
            concrete injury as a result of Defendants' conduct.  Although he alleges
5           that Defendants refused to respond to his letters and grievances, placed
            false information into his mental health file, threatened him, and refused
6           him food and showers an unspecified number of times, Plaintiff has failed
            to demonstrate that Defendants' conduct caused him to suffer a
7           particularized and concrete injury of a legally protected interest.
            Consequently, Plaintiff lacks standing to bring this action and, therefore,
8           Defendants are entitled to summary judgment.

9   Given that defendants seek summary judgment as to the entire action based on lack of standing, it

10  follows that defendants' argument necessarily fails if plaintiff has standing to bring even one of

11  his claims.

12          The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity,

13  civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).

14  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452

15  U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing,

16  shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080,

17  1107 (9th Cir. 1986).  In their motion, defendants state that plaintiff "alleges that Defendants . . .

18  refused him food and showers. . . ."  Thus, as defendants concede, plaintiff has alleged a

19  particularized and concrete injury – deprivation of food and sanitation in violation of the Eighth

20  Amendment.  In other words, plaintiff has a legally protected interest in conditions of

21  confinement which comport with the requirements of the Eighth Amendment, and he has alleged

22  that this interest was injured by defendants' denial of food and showers.  Because plaintiff has

23  standing to bring this action, defendants' argument fails.[29]

24  / / /

25          [29]     The court addressed below defendants arguments that plaintiff cannot establish a
26  necessary element of any particular claim,

23

1

**C.    Grievance Process**

2 Plaintiff claims that, on June 3, 2001, he submitted a "formal complaint CDC 602

3 and cover letter" to defendant Pliler but that it was "obstructed from being process by D.

4 Kimbrell." He also alleges that he sent defendant Pliler another grievance on June 6, 2001,

5 outlining alleged instances of staff misconduct, but that defendant Pliler "did nothing whatsoever

6 to alleviate or even address the life threatening serious condition of my confinement by any

7 conventional means to address my concerns. . . ." Defendants argue that, as a matter of law,

8 plaintiff cannot state any claims based on his allegations that his grievances were ignored or not

9 properly processed. The court agrees.

10 Defendants are correct that there is no stand-alone right to any particular

11 grievance process. See Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988); see also Ramirez v.

12 Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (holding that there is no liberty interest entitling

13 inmates to a specific grievance process). Because there is no right to any particular grievance

14 process, it is impossible for plaintiff's due process rights to have been violated by ignoring his

15 grievances or failing to properly process them. Defendants' citation to numerous district courts

16 in this circuit that have reached the same conclusion is persuasive. See Smith v. Calderon, 1999

17 WL 1051947 (N.D. Cal 1999) (finding that failure to properly process grievances did not violate

18 any constitutional right); Cage v. Cambra, 1996 WL 506863 (N.D. Cal. 1996) (concluding that

19 prison officials' failure to properly process and address grievances does not support

20 constitutional claim); James v. U.S. Marshal's Service, 1995 WL 29580 (N.D. Cal. 1995)

21 (dismissing complaint without leave to amend because failure to process a grievance did not

22 implicate a protected liberty interest); Murray v. Marshall, 1994 WL 245967 (N.D. Cal. 1994)

23 (concluding that prisoner's claim that grievance process failed to function properly failed to state

24 a claim under § 1983).

25 / / /

26 / / /

1    　　　　　To the extent plaintiff is attempting to assert that the alleged failure to respond to

2    or properly process his prison grievances resulted in an unconstitutional interference with his

3    access to the courts, plaintiff cannot prevail.  Prisoners have a First Amendment right of access to

4    the courts.  See Lewis v. Casey, 518 U.S. 343, 346 (1996); Bounds v. Smith, 430 U.S. 817, 821

5    (1977); Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995) (discussing the right in the context of

6    prison grievance procedures).  This right includes petitioning the government through the prison

7    grievance process.  See id.  Prison officials are required to "assist inmates in the preparation and

8    filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate

9    assistance from persons trained in the law."  Bounds, 430 U.S. at 828.  The right of access to the

10   courts, however, only requires that prisoners have the capability of bringing challenges to

11   sentences or conditions of confinement.  See Lewis, 518 U.S. at 356-57.  Moreover, the right is

12   limited to non-frivolous criminal appeals, habeas corpus actions, and § 1983 suits.  See id. at 353

13   n.3 & 354-55.  Therefore, the right of access to the courts is only a right to present these kinds of

14   claims to the court, and not a right to discover claims or to litigate them effectively once filed.

15   See id. at 354-55.

16   　　　　　As a jurisdictional requirement flowing from the standing doctrine, the prisoner

17   must allege an actual injury.  See id. at 349.  "Actual injury" is prejudice with respect to

18   contemplated or existing litigation, such as the inability to meet a filing deadline or present a

19   non-frivolous claim.  See id.; see also Phillips v. Hust, 477 F.3d 1070, 1075 (9th Cir. 2007).

20   Delays in providing legal materials or assistance which result in prejudice are "not of

21   constitutional significance" if the delay is reasonably related to legitimate penological purposes.

22   Lewis, 518 U.S. at 362.

23   　　　　　In this case, it is impossible for plaintiff to establish the requisite actual injury.

24   Any claim of denial of access to the courts necessarily flows from the notion that plaintiff was

25   unable to exhaust his administrative remedies.  However, defendants in this case never argued

26   failure to exhaust as an affirmative defense.  Therefore, even if plaintiff's efforts to exhaust were

1  thwarted, he suffered no prejudice to his ability to file suit as a result.

2      For these reasons, the court concludes that defendants are entitled to judgment as

3  a matter of law on any claims arising from plaintiff's allegations concerning the grievance

4  process.

5      **D.    Retaliation**

6      In order to prevail on a claim under 42 U.S.C. § 1983 for retaliation, the prisoner

7  must establish that he was retaliated against for exercising a constitutional right, and that the

8  retaliatory action was not related to a legitimate penological purpose, such as preserving

9  institutional security.  See Barnett v. Centoni, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam).

10 In meeting this standard, the prisoner must submit evidence establishing a specific link between

11 the alleged retaliation and the exercise of a constitutional right.  See Pratt v. Rowland, 65 F.3d

12 802, 807 (9th Cir. 1995); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-39 (9th Cir. 1989).

13 The prisoner must also establish that his constitutional right was actually chilled by the alleged

14 retaliatory conduct.  See Resnick v. Hayes, 213 F.3d 443, 449 (9th Cir. 2000).  Thus, the prisoner

15 plaintiff must establish the following in order to prevail on a claim of retaliation:  (1) prison

16 officials took adverse action against the inmate; (2) the adverse action was taken because the

17 inmate engaged in protected conduct; (3) the adverse action actually chilled the inmate's First

18 Amendment rights; and (4) the adverse action did not serve a legitimate penological purpose.

19 See Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  It is the prisoner's burden to

20 establish that there were no legitimate penological purposes motivating the actions of which he

21 complains.  See Pratt, 65 F.3d at 808.  Finally, retaliation claims are evaluated in light of the

22 deference generally accorded prison officials.  See id. at 807.

23     Defendants argue that they are entitled to judgment as a matter of law on

24 plaintiff's claims of retaliation because: (1) plaintiff cannot establish that any adverse action was

25 taken because plaintiff engaged in protected activity; (2) plaintiff's First Amendment rights were

26 not actually chilled by any adverse action; and (3) defendants' conduct served legitimate

1    penological interests.  Assuming for the moment that plaintiff can establish that adverse action

2    was taken because he filed inmate grievances complaining of alleged staff misconduct, the court

3    agrees with defendants on the basis of their second argument.  As defendants point out, the

4    proper First Amendment inquiry asks "whether an official's acts would chill or silence a person

5    of ordinary firmness from future First Amendment activities."  Rhodes, 408 F.3d at 568.  Based

6    on plaintiff's complaint, the last act of retaliation occurred on January 31, 2002.  Specifically,

7    plaintiff claims that associate warden Chastain and officers Martel and Mini prepared false

8    documents for the purpose of placing him in the general population in disregard of an alleged

9    safety risk and that they did this in retaliation "for all my writing and complaints on staff

10   misconduct."  However, as defendants' evidence demonstrates, plaintiff successfully submitted

11   numerous grievances after this date through at least April 2002.  Further, he was able to

12   successfully file the instant action and defendants have not alleged a failure to exhaust his claims.

13          For these reasons, the court finds that plaintiff cannot establish that his right to

14   engage in protected activity was actually chilled.  Therefore, defendants are entitled to summary

15   judgment on all of plaintiff's retaliation claims.

16

17                                **IV.  CONCLUSION**

18          Aside from arguing that plaintiff does not have standing to assert any claims and

19   that all his claims are time-barred, defendants do not raise any specific arguments with respect to

20   plaintiff's Eighth Amendment claims regarding denial of food and showers or plaintiff's due

21   process claims regarding false disciplinary charges and violations in the context of disciplinary

22   hearings.  Based on plaintiff's complaint, his Eighth Amendment claims arise from his

23   allegations that Matthews, Turner, Villasenor, Ranzany, Ugalino, Gonzales, and Smith denied

24   him food and/or showers.   Of these individuals, only Ranzany and Ugalino remain as defendants

25   to this action.  Plaintiff's due process claims arise from his allegations that Matthews, Turner,

26   Villasenor, Ranzany, Ugalino, Gonzales, Lt. Johnson, Connor, Gold, and Goughnour filed false

                                              27

disciplinary charges and/or deprived plaintiff of procedural protections in the context of disciplinary hearings.  Of these individuals, only Ranzany, Ugalino, Lt. Johnson, Connor, Gold, and Goughnour remain as defendants.  The litigation will continue on these claims.

In summary, the court finds:

1.  Plaintiff's complaint does not state any cognizable claims based on his allegations concerning fraudulent and/or false documents having been placed in his medial file resulting in improper EOP and/or CCCMS placement, or his allegations that he received unwanted mental health treatment;

2.  Plaintiff's complaint does not state any cognizable claim of conspiracy;

3.  No claim based on plaintiff's allegation that correctional officer Andrade put handcuffs on too tightly is properly before the court because Andrade was not named as a defendant;

4.  No claim based on plaintiff's allegation that he was returned to the general population by the "classification committee" and/or May is properly before the court because none of the members of such committee or May were named as defendants;

5.  Defendants have not met their burden of establishing that any of plaintiff's claims are barred by the applicable statute of limitations;

6.  Plaintiff has standing to bring suit;

7.  Defendants are entitled to judgment as a matter of law on plaintiff's claims arising from his allegations relating to the prison grievance process;

8.  Defendants are entitled to judgment as a matter of law on plaintiff's retaliation claims;

9.  This action should proceed on plaintiff's Eighth Amendment claims against defendants Ranzany and Ugalino, and plaintiff's due process claims against defendants Ranzany, Ugalino, Lt. Johnson, Connor, Gold, and Goughnour.

/ / /

/ / /

/ / /

/ / /

/ / /

1    Based on the foregoing, the undersigned recommends that:

2        1.    Defendants' motion for summary judgment (Doc. 72) be granted in part, as

3 outlined above;

4        2.    This action proceed on plaintiff's Eighth Amendment claims against

5 defendants Ranzany and Ugalino and plaintiff's due process claims against defendants Ranzany,

6 Ugalino, Lt. Johnson, Connor, Gold, and Goughnour;

7        3.    Pliler, Shrode, Ewing, Kelly, Clavere, Shoemaker, Baxter, Stiles, Rosario,

8 Lord, Murphy, Rogel, Kimbrell, Peterson, Jaffe, Vance, Dr. Johnson, and Phillippi be terminated

9 as defendants to this action; and

10       4.    This matter be referred back to the Magistrate Judge for further

11 proceedings.

12       These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

14 after being served with these findings and recommendations, any party may file written

15 objections with the court.  The document should be captioned "Objections to Magistrate Judge's

16 Findings and Recommendations."  Failure to file objections within the specified time may waive

17 the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18

19  DATED:  July 9, 2009

20                                                 _____
                                                   Craig M. Kellison
21                                                 **CRAIG M. KELLISON**
                                                   UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26