**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

GREGORY ANDREW HALL,                    No. CIV S-05-1556-CMK-P

            Plaintiff,

   vs.                                    <u>MEMORANDUM OPINION AND ORDER</u>

C. PLILER, et al.,

            Defendants.

_____/

        Plaintiff, proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983.   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c). Pending before the court is Defendants' supplemental motion for summary judgment (Doc. 94). Plaintiff filed a response, but not a formal opposition to the motion (Doc. 97).

**I.  BACKGROUND**

        The court previously granted in part and denied in part a prior motion for summary judgment (Docs. 77, 84).  Pursuant to the order granting in part the prior motion for summary judgment, the only defendants remaining in this case are Ranzany, Ugalino, Lt. Johnson, Connor, Gold, Goughnour.  The only claims remaining are Plaintiff's Eighth

Amendment claims regarding denial of food and showers, and his due process claims regarding

false disciplinary charges and violations in the context of disciplinary hearings.

## A.     Summary of Plaintiff's Claims

The court previously summarized Plaintiff's claims in relation to the prior motion

for summary judgment, and repeats here only those allegations relevant to the remaining claims:

> This action proceeds on plaintiff's original complaint. Plaintiff does not set forth any specific constitutional claims but, rather, outlines in mostly chronological order a series of factual allegations. One paragraph of the complaint, however, appears to be a general statement of the nature of his claims. Plaintiff states:

> > I've never filed a lawsuit before[1] and I'm having a hard time trying to hold my emotions in check with regards to civil service employees premeditated and sophisticated malice and inhumane treatment they are subjecting me to, and I've only been convicted of a petty theft of two coffee jars with a total cost of $9.98 and these people (staff) are comitting [sic] a federal offense against me, by conspiracy under the color of law, and they have wage an attack knowingly with so many staff to seek the advantage to oppress my rights, confronting me with so many and numerous acts of misconduct that the writing of this civil rights complaint with details to me the criteria for the court to take action because I'm a victim of crimes pursuant to federal laws and state laws by prison staff. I need "HELP" just to get this complaint filed right, so they (staff) don't get away with their crimes against me and the laws of the legal community or courts or laws of land. . . .(emphasis in original).

> > Plaintiff states that he arrived at California State Prison – Sacramento ("CSP-Sac.") on May 31, 2001. According to plaintiff, upon his arrival be was mistreated by correctional officers. Specifically, he claims that officer Andrade placed handcuffs on him too tight causing him to "cry[] out loud in pain for four hours."[2] He also claims that officers Matthews, Turner, Villasenor, Ranzany, Ugalino, and Gonzales harassed him by denying him food and showers, and by "opening and closing my

---

[1]     This statement is puzzling given that, earlier in the complaint, plaintiff lists the docket numbers of four previous actions filed in this court.

[2]     Andrade was not named as a defendant to this action.

cell door continually" and "coming by my cell door whispering threats."[3] He also alleges that these officers made "fraudulent and false disciplinary allegations to make my time of imprisonment longer." Plaintiff further asserts that these officers sent "prison gang members to my cell door trying to intimidate me and terrorize me by try to pick a fight with me. . . ." He states that the officers acted "in retaliation for me filing inmate appeals on staff."

. . .

Next, plaintiff alleges that, on June 13, 2001, he was assigned to be housed in the general population "for the sole purpose to have me attacked." He states that this assignment was made notwithstanding his having submitted "formal letters to the warden and [classification] committee members" regarding alleged staff misconduct and safety concerns.

Plaintiff states that "during this period of time" there was a lock-down of "more than half of the African American inmates on Facility C-Yard" due to "staff assaults on inmates or inmates and staff fights." He states that he was "one of the few African Americans not on lock-down." According to plaintiff, on June 18, 2001, correctional officer Matthews ordered him transferred to "the Block where the violent incidence with staff happen." Plaintiff states that he refused to be transferred and that "the same day, some staff I did not know came to my cell saying 'you're going to get it!'" Plaintiff adds: "That evening C/O Gonzales . . . alleged fraudulently that I was masturbating to get [me] removed and placed in administrative segregation." He states that he was placed in a "holding cage" but was later released back to his cell after "Sgt. Featherly determined that the allegations was false. . . ."[4] Plaintiff claims that ultimately he was placed in administrative segregation on June 20, 2001, because he submitted an inmate grievance "to expose the prostitution racket by staff that flourish . . . by a code of silence and secrecy."

According to plaintiff, between June 20, 2001, and July 25, 2001, officer Ranzany "came to Facility-A ad. seg. and threaten me, making his finger like a gun and pointing it at me." Plaintiff states that he sent "another complaint" to the warden the following day. . . .

. . .

/ / /

/ / /

---

[3]     Gonzales was dismissed on July 1, 2008, for failure to effect timely service. Matthews, Turner, and Villasenor were not named as defendants.

[4]     Featherly was not named as a defendant.

Next, plaintiff alleges that, on October 14, 2001, he was denied a shower by officer Smith.[5]  He also claims that, on December 15, 2001, officer Smith "put foreign particles in my food that would choke me."  He adds that officer Smith "made threats and harass me between these two dates."  Plaintiff states that, on October 24, 2001, officer Shrode told plaintiff "We'll get you, you are by yourself" and, while the officer was walking away, he added: "We gone kill that bastard."  According to plaintiff, on November 2, 2001, officers Chastain and Mini "sign fraudulent and false documents to send me to Facility B, by deliberate indifference and totally a reckless disregards for my health and safety to set the stage for me to be assaulted or murdered, because I went on tape about staff and inmates attempts and threats on my life. . . ."[6]  Plaintiff states that he received "another fraudulent and false reviews of guilty findings for not following a order to go to A-Yard on Nov. 28, 2001."[7]  He alleges that, on January 31, 2002, associate warden Chastain and officers Martel and Mini "again with deliberate indifference and totally reckless disregards for my health and safety sign fraudulent documentations and record to remove me from Ad. Seg. and send me back to C-Yard for the sole purpose to bring about my murder or assault in retaliation for all my writing and complaints on staff misconduct."  He states that "[e]ven Capt. Mandeville provided a false . . . report that does not address, nor cover the true risk, especially threats by Sgt. Rogel and Sgt. Murphy and controlled inmate(s) element."[8]

Next, plaintiff states that, on December 2, 2001, "the same C/O Gonzales that I wrote a complaint about making false allegations of masturbation to Sgt. Featherly on June 19, 2001, . . . found her way from C-Yard to A-Yard and to my Ad. Seg. unit by the support of Lt. Gold and other staff, and wrote a fraudulent allegation of masturbation to turn my lock-up to take time from me."  Plaintiff claims that officer Gold denied him the opportunity to call a witness at a rules violation hearing resulting from the December 2, 2001, rules violation.  He adds that associate warden Goughnour "upheld the due process violation and fraudulent report."

. . .

---

[5]      Smith was dismissed on July 1, 2008, for failure to effect timely service.

[6]      There is no "Mini" listed in the complaint as a defendant.  Minyard was named as a defendant but was dismissed on July 1, 2008, for failure to state a claim.  Chastain was not named as a defendant.

[7]      As discussed below, defendants' undisputed evidence shows that plaintiff was charged with a rules violation on November 10, 2001, for failing to return to the general population yard upon being ordered to do so.  Given the reference to November 28, 2001, it appears this allegation relates to a subsequent inmate appeal regarding the November 10, 2001, charge.

[8]      Mandeville was not named as a defendant.

4

Next, plaintiff returns to his allegations regarding his being ordered to return to the general population despite risks to his safety.  He claims that, on January 31, 2002, officer May ordered him to return to the general population and threatened him with a rules violation charge if he did not comply.[9]  Plaintiff did not comply and officer May charged him with a rules violation.  Plaintiff states that this rules violation was "classified" by officer Schroeder, he was found guilty by officer Johnson, and the finding was upheld by officers Connor and associate warden Goughnour.[10]  Plaintiff states that he was placed in administrative segregation as a result of this violation and that such placement was in violation of his due process rights because he "never received a CDC-114 lock-up order."  He states that he was in administrative segregation from January 31, 2002, through March 12, 2002, without an appropriate lock-up order.

. . .

The remainder of plaintiff's allegations, which cover the period from March 18, 2002, through July 15, 2002, do not relate to correctional staff who were named as defendants in the complaint.

(Findings and Recommendations, Doc. 77, at 2-9).[11]

B.    **The Parties' Evidence**

Defendants filed with their motion a statement of undisputed facts.  Plaintiff's only opposition to the motion is an unsigned two page response, wherein he states the motion is defective because the Defendants previously indicated the matter is ready for trial, his claims have nothing to do with his conviction or duration of his sentence, and if the Defendants were entitled to qualified immunity he would have previously been so informed.  He does not, however, object to any of the Defendants' undisputed facts, nor does he submit any evidence to support his claim.  The opposition/response he filed is not even signed under penalty of perjury for the court to be able to consider it a declaration.

/ / /

/ / /

---

[9]    May was not named as a defendant.

[10]    Schroeder was not named as a defendant.

[11]    Only the portion of the summary of facts relevant to the remaining claims is included.  Footnote numbers have been modified to correlate with this order.

In the unopposed statement of undisputed facts, Defendants set forth the following relevant facts:[12]

1.  On June 20, 2001, plaintiff reported to staff that his safety might be in jeopardy if he remained in the C-Facility General Population.  In response to this complaint, plaintiff was placed in administrative segregation for his safety and an investigation was ordered;

2.  A hearing on plaintiff's rules violation was held on July 11, 2001, and plaintiff was found guilty of disobeying orders;[13]

3.  On July 12, 2002, plaintiff was charged with another rules violation for refusing to relinquish his food tray when ordered to do so.[14]

4.  Defendant Johnson conducted the disciplinary hearing on this rules violation on August 8, 2001.  Plaintiff was provided with a staff assistant, Plaintiff acknowledged receipt of the rules violation report, and all time constraints were noted to have been met.  Plaintiff was found guilty and assessed 30 days credit forfeiture;

5.  On August 15, 2001, plaintiff was interviewed by an investigating officer in relation to Plaintiff's report of June 20, 2001, that his safety might be in jeopardy in C-Facility;

6.  The investigating officer reported the following relevant information:

> HALL conveyed since his arrival, he has realized
> staff at SAC are involved in corruption, organized
> crime, and a plot to murder him.  HALL came to
> this conclusion based on his prior reports of staff

---

[12]   Defendants provide additional evidence relating to other disciplinary actions which do not appear to the court to have been raised in the complaint.  As the court reads the remaining claims, Plaintiff alleges denial of due process and false allegations relating to disciplinary charges in November 2001, December 2001, and January 2002.  The court does not, therefore, summarize any of the other disciplinary proceedings contained in the statement of undisputed facts.

[13]   Defendants cite "DX A-1, p. 7" in support of this statement.  Presumably, Defendants mean to refer the court to Exhibit A of their separate statement of undisputed facts filed in support of summary judgment.  Page 7 of Exhibit A does not relate to a July 11, 2001, hearing.  Rather, page 7 appears to be a summary of Plaintiff's movement history.  The July 11, 2001, hearing is referenced in a document at Exhibit A, page 33, which is a copy of a June 15, 2001, rules violation report for disobeying a direct order to return to his cell.  It does not appear that any of the remaining defendants were involved in this hearing.

[14]   Defendants state this occurred on August 12, 2001.  However, reviewing the rules violation report contained in Exhibit A, at page 27, it appears that date is a typo, and the incident occurred on July 12, 2001.  The hearing, however, was conducted on August 8, 2001.

misconduct while housed at other institutions, and he believes all the institutions are working together as a tag team against him.

HALL further stated when staff spoke to him, they pointed their index finger towards him with their thumb upward.  HALL interpreted this as a threat because the hand gestures resemble a gun.  In addition, staff would tell him to go to bed, and he felt very disrespected because he is 42 years old.

HALL stated gang members were coming to his cell door and asking him what set he was from.  HALL also stated inmate "Kenny" came to his cell and told him he was writing too much paper on staff, and he needed to stop.  HALL perceived this as a threat from staff.  [It was also noted in the report there is no inmate "Kenny" in C-Facility].

HALL was adamant he is not delusional or crazy.  HALL admitted things could mean something different, but it is his interpretation of situations that cause him to react.  HALL stated he wants to stay in Ad/Seg because he is working with Dr. Baxter and wants to ensure California State Prison-Sacramento (SAC) has not caused him to have any mental health issues.  In addition, he believes C-Facility staff are a threat to him, and he cannot trust them.

7.    Plaintiff was cleared for release from administrative segregation and scheduled to be returned to the general population B-Facility on November 8, 2001, with a notation that Plaintiff had no known enemies housed in B-Facility;

8.    On November 10, 2001, Plaintiff was charged with a rules violation when he refused an order by a correctional officer to pack his property and prepare to move back to the general population;

9.    On November 15, 2001, the classification committee decided to retain Plaintiff in administrative segregation pending the outcome of the November 10, 2001, rules violation;

10.   A hearing on the rules violation was held on December 12, 2001.  Plaintiff was not assigned a staff assistant, but was assigned an investigative employee.  Plaintiff was found guilty and assessed 10 days credit forfeiture.  The report was reviewed and signed off by Defendant Connor and Associate Warden Burruel;

11.   Plaintiff was issued another rules violation, for indecent exposure/masturbation, on December 2, 2001.  The hearing was held on January 7, 2002, with Defendant Gold acting as the Senior Hearing Officer.  It was

noted Plaintiff had waived a staff assistant, but was assigned an investigative employee.  Plaintiff requested three witnesses, two of whom testified but the third could not be brought to the hearing.[15]  Defendant Gold stipulated to the answers this third witnesses would have given to Plaintiff's proposed questions.  Plaintiff was found guilty and assessed 90 days loss of credit and five days loss of privileges.  Defendants Gold and Goughnour reviewed the disposition.

12.   On January 31, 2002, Plaintiff received another disciplinary violation for refusing to leave administrative segregation.  A hearing was held on February 15, 2002, wherein Defendant Johnson served as the Senior Hearing Officer.  Plaintiff was disrespectful and disruptive during the hearing, so he was removed and the hearing continued without him.  Plaintiff had requested two witnesses, who both had previously provided statements to the investigating employee, so Defendant Johnson determined they would provide no additional, relevant information.  Plaintiff was found guilty and assessed 30 days credit loss.

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential

---

[15]    Plaintiff also apparently requested several other witnesses who were disallowed, including District Attorney Jan Scully and Judge Hoke, as they were not present during the alleged incident.

1    to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.

2    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

3    necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

4    should be granted, "so long as whatever is before the district court demonstrates that the standard

5    for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

6              If the moving party meets its initial responsibility, the burden then shifts to the

7    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

8    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

9    establish the existence of this factual dispute, the opposing party may not rely upon the

10   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

11   form of affidavits, and/or admissible discovery material, in support of its contention that the

12   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

13   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

14   of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

15   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

16   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

17   for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

18             In the endeavor to establish the existence of a factual dispute, the opposing party

19   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

20   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

22   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

23   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

24   committee's note on 1963 amendments).

25   / / /

26

1       In resolving the summary judgment motion, the court examines the pleadings,

2   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3   any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

4   Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

5   before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

6   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

7   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

8   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

9   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

10  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

11  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

12  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

## III. DISCUSSION

14      Defendants argue that they are entitled to summary judgment because: (1) Plaintiff

15  is not entitled to the relief requested; (2) Plaintiff's Fourteenth Amendment claims are barred

16  because success in this action would implicitly question the validity of conviction or the duration

17  of his sentence; and (3) the Defendants are entitled to qualified immunity.

### A.  Eighth Amendment Claims

19      The treatment a prisoner receives in prison and the conditions under which the

20  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

21  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

22  511 U.S. 825, 832 (1994).  The Eighth Amendment "embodies broad and idealistic concepts of

23  dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102

24  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

25  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

26  "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy,

801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only

when two requirements are met: (1) objectively, the official's act or omission must be so serious

such that it results in the denial of the minimal civilized measure of life's necessities; and (2)

subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

official must have a "sufficiently culpable mind."  See id.

Allegations of verbal harassment do not state a claim under the Eighth

Amendment unless it is alleged that the harassment was "calculated to . . . cause [the prisoner]

psychological damage." Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987); see also

Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996), amended by 135 F.3d 1318 (9th Cir. 1998).

"Adequate food is a basic human need protected by the Eighth Amendment."

Keenan, 83 F.3d at 1091 (9th Cir. 1996) (citing Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.

1982)).  "While prison food need not be 'tasty or aesthetically pleasing,' it must be 'adequate to

maintain health.'" Id. (quoting LaMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993)).  The

deprivation of food may constitute cruel and unusual punishment if it denies a prisoner the

minimal civilized measure of life's necessities.  See Talib v. Gilley, 138 F.3d 211, 214 n.3 (5th

Cir. 1998).  But whether it "falls below this threshold depends on the amount and duration of the

deprivation." Id.  "[O]nly those deprivations denying 'the minimal civilized measure of life's

necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson

v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

Similarly, inmates are guaranteed sanitation and personal hygiene supplies.  See Keenan, 83 F.3d

at 1091 (citing Hoptowit, 682 F,2d at 1246).

Plaintiff's claims regarding the denial of food and showers, the opening and

closing of his cell door, and the threats he perceived are inadequate to support his claim for

violation of the Eighth Amendment.  Plaintiff's allegations are conclusory and fail to provide any

specification as to when, how often, and for how long he was denied either food or showers, his

1   cell door was manipulated, or what exactly he was threatened with and by whom.  The only

2   specific threat identified was one of the defendants pointing a finger at him shaped like a gun.

3   Plaintiff also fails to provide any evidentiary support for his claims.

4           The court finds Plaintiff's conclusory allegations do not rise to the level of a

5   deprivation that satisfies the objective prong of deliberate indifference in violation of the Eighth

6   Amendment.  See Farmer, 511 U.S. at 834.  Plaintiff fails to set forth when he was denied food

7   and shower or for how long.  Temporary unconstitutional conditions of confinement do not rise

8   to the level of constitutional violations.  See Anderson v. County of Kern, 45 F.3d 1310 (9th Cir.

9   1995).  Accordingly, summary judgment will be entered in favor of the Defendants for Plaintiff's

10  Eighth Amendment violation claims.

11          **B.      Due Process Claims**

12          The Due Process Clause protects prisoners from being deprived of life, liberty, or

13  property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to

14  prevail on a claim of deprivation of due process, a plaintiff must first establish the existence of a

15  liberty or property interest for which the protection is sought.  See Ingraham v. Wright, 430 U.S.

16  651, 672 (1977); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972).  Due process protects against

17  the deprivation of property where there is a legitimate claim of entitlement to the property.  See

18  Bd. of Regents, 408 U.S. at 577.  Protected property interests are created, and their dimensions

19  are defined, by existing rules that stem from an independent source – such as state law – and

20  which secure certain benefits and support claims of entitlement to those benefits.  See id.

21          Liberty interests can arise both from the Constitution and from state law.  See

22  Hewitt v. Helms, 459 U.S. 460, 466 (1983); Meachum v. Fano, 427 U.S. 215, 224-27 (1976);

23  Smith v. Sumner, 994 F.2d 1401, 1405 (9th Cir. 1993).  In determining whether the Constitution

24  itself protects a liberty interest, the court should consider whether the practice in question ". . . is

25  within the normal limits or range of custody which the conviction has authorized the State to

26  impose."  Wolff, 418 U.S. at 557-58; Smith, 994 F.2d at 1405.  Applying this standard, the

1    Supreme Court has concluded that the Constitution itself provides no liberty interest in good-

2    time credits, see Wolff, 418 U.S. at 557; in remaining in the general population, see Sandin v.

3    Conner, 515 U.S. 472, 485-86 (1995); in not losing privileges, see Baxter v. Palmigiano, 425

4    U.S. 308, 323 (1976); in staying at a particular institution, see Meachum, 427 U.S. at 225-27; or

5    in remaining in a prison in a particular state, see Olim v. Wakinekona, 461 U.S. 238, 245-47

6    (1983).

7            In determining whether state law confers a liberty interest, the Supreme Court has

8    adopted an approach in which the existence of a liberty interest is determined by focusing on the

9    nature of the deprivation.  See Sandin v. Connor, 515 U.S. 472, 481-84 (1995).  In doing so, the

10   Court has held that state law creates a liberty interest deserving of protection only where the

11   deprivation in question: (1) restrains the inmate's freedom in a manner not expected from the

12   sentence; and (2) "imposes atypical and significant hardship on the inmate in relation to the

13   ordinary incidents of prison life."  Id. at 483-84.  Prisoners in California have a liberty interest in

14   the procedures used in prison disciplinary hearings where a successful claim would not

15   necessarily shorten the prisoner's sentence.  See Ramirez v. Galaza, 334 F.3d 850, 853, 859 (9th

16   Cir. 2003) (concluding that a due process challenge to a prison disciplinary hearing which did not

17   result in the loss of good-time credits was cognizable under § 1983); see also Wilkinson v.

18   Dotson, 544 U.S. 74, 82 (2005) (concluding that claims which did not seek earlier or immediate

19   release from prison were cognizable under § 1983).

20           With respect to prison disciplinary proceedings which result in the loss of good-

21   time credits, due process requires prison officials to provide the inmate with: (1) a written

22   statement at least 24 hours before the disciplinary hearing that includes the charges, a description

23   of the evidence against the inmate, and an explanation for the disciplinary action taken; (2) an

24   opportunity to present documentary evidence and call witnesses, unless calling witnesses would

25   interfere with institutional security; and (3) legal assistance where the charges are complex or the

26   inmate is illiterate.  See Wolff, 418 U.S. at 563-70.  Due process is satisfied where these

1  minimum requirements have been met, see Walker v. Sumner, 14 F.3d 1415, 1420 (9th Cir.

2  1994), and where there is "some evidence" in the record as a whole which supports the decision

3  of the hearing officer, see Superintendent v. Hill, 472 U.S. 445, 455 (1985).  The "some

4  evidence" standard is not particularly stringent and is satisfied where "there is any evidence in

5  the record that could support the conclusion reached."  Id. at 455-56.  However, a due process

6  claim challenging the loss of good-time credits as a result of an adverse prison disciplinary

7  finding is not cognizable under § 1983 and must be raised by way of habeas corpus.  See

8  Blueford v. Prunty, 108 F.3d 251, 255 (9th Cir. 1997).

9          Here, there appear to be four prison disciplinary proceedings[16] at issue:

10             1.    August 2001:

11          The disciplinary hearing held on August 8, 2001, related to the rules violation

12  report issued on July 12, 2002, for failure to relinquish a food tray.  Defendant Johnson presided

13  over the August 8, 2001, hearing.  The hearing report notes, and Plaintiff fails to provide any

14  evidence to contradict, that he was provided copies of the reports more than 24 hours prior to the

15  hearing, he was provided the opportunity to present evidence or call witnesses, and was assigned

16  a staff assistant but waived an investigative employee.  The disposition was based on the

17  testimony and report from the reporting officer who testified he ordered Plaintiff to return the

18  food tray, and Plaintiff refused to give it to him.  Therefore, all of the minium requirements were

19  met, there was some evidence to support the decision, and there was no due process violation.

20  (Def. Ex. A, at 27-32).

21  / / /

22

23          [16]    The court notes, as Defendants argue, that Plaintiff was assessed with the loss of
    credits in each of these proceedings.  Therefore, success on these claims would necessarily imply
24  the invalidity of his sentence, rendering these claims non-cognizable in a § 1983 action.  See
    Edwards v. Balisok, 520 U.S. 641, 646 (1987) (holding that § 1983 claim not cognizable because
25  allegations of procedural defects and a biased hearing officer implied the invalidity of the
    underlying prison disciplinary sanction).  However, as the court finds no due process violation,
26  the validity of his claim is immaterial.

1          2.      December 2001:

2          The disciplinary hearing held on December 12, 2001, related to the rules violation

3    report issued November 10, 2001, for refusing a direct order to pack his property.  The only

4    involvement from a defendant appears to be Defendant Connor's review of the report following

5    the hearing.  The hearing report notes, and again Plaintiff fails to provide any evidence to

6    contradict, that he was provided copies of the reports more than 24 hours prior to the hearing, he

7    was assigned an investigative employee, and he did not request any witnesses.  The disposition

8    was based on the reporting officer's report and the investigative employee's report, which

9    constitutes some evidence.  Therefore, the minimum requirements were met, there was some

10   evidence to support the decision, and there was no due process violation.  (Def. Ex. A, at 35-40).

11         3.      January 2002:

12         The disciplinary hearing held on January 7, 2002, related to the rules violation

13   report issued December 2, 2001, for indecent exposure/masturbation.  Defendant Gold presided

14   over the January 7, 2002, hearing.  The hearing report notes, and Plaintiff again fails to provide

15   any evidence to contradict, that he was provided copies of the reports more than 24 hours prior to

16   the hearing, he waived a staff assistant, was assigned an investigative employee, and he was

17   provided the opportunity to present evidence or call witnesses.  Plaintiff had requested several

18   witnesses, some of whom were disallowed as they were not present during the alleged incident.

19   Plaintiff's request for four witnesses was allowed, three of whom testified at the hearing.  The

20   fourth witness, an inmate, was not available to testify so Defendant Gold stipulated to the

21   testimony this inmate would have given.  The disposition was based on the testimony and report

22   from the reporting officer who testified as to her observations and command to stop, and

23   Plaintiff's statements.  Defendants Connor and Goughnour reviewed the report and disposition.

24   The minium requirements were met, there was some evidence to support the decision, and there

25   was no due process violation.  (Def. Ex. A, at 41-47).

26   ///

1        4.      <u>February 2002</u>:

2        The disciplinary hearing held on February 15, 2002, related to the rules violation

3 report issued January 31, 2002, for refusing to leave administrative segregation.  Defendant

4 Johnson presided over the February 15, 2002, hearing.  The hearing report notes, and Plaintiff

5 fails to provide any evidence to contradict, that he was provided copies of the reports more than

6 24 hours prior to the hearing, and he waived a staff assistant, but was assigned an investigative

7 employee.  Plaintiff became disruptive and disrespectful during the hearing process, so he was

8 removed and the hearing continued in absentia.  Plaintiff had not requested any witnesses prior to

9 his removal from the hearing, but previously had requested two witnesses.  The witnesses had

10 provided statements to the investigative employee, so Defendant Johnson found they would not

11 add any additional relevant information at the hearing.  The disposition was based on the report

12 from the reporting officer which stated Plaintiff had informed him he would not transfer and

13 would not go to C-Facility.  The minium requirements were met, there was some evidence to

14 support the decision, and there was no due process violation.  (Def. Ex. A, at 48-51).

15        As no due process violations occurred at any of these hearings, summary

16 judgment will be entered in favor of the Defendants.

17        **C.      QUALIFIED IMMUNITY**

18        Government officials enjoy qualified immunity from civil damages unless their

19 conduct violates "clearly established statutory or constitutional rights of which a reasonable

20 person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  In general,

21 qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

22 law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

23 immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting

24 the injury, the facts alleged show the defendant's conduct violated a constitutional right.  <u>See</u>

25 <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

26 step is to ask whether the right was clearly established.  <u>See id.</u>  This inquiry "must be undertaken

1    in light of the specific context of the case, not as a broad general proposition . . . ."  Id.  "[T]he

2    right the official is alleged to have violated must have been 'clearly established' in a more

3    particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

4    clear that a reasonable official would understand that what he is doing violates that right."  Id. at

5    202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

6    officer in similar circumstances would have thought his conduct violated the alleged right.  See

7    id. at 205.

8            When identifying the right allegedly violated, the court must define the right more

9    narrowly than the constitutional provision guaranteeing the right, but more broadly than the

10   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

11   (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

12   sufficiently clear that a reasonable official would understand [that] what [the official] is doing

13   violates the right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the

14   court concludes that a right was clearly established, an officer is not entitled to qualified

15   immunity because a reasonably competent public official is charged with knowing the law

16   governing his conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even

17   if the plaintiff has alleged a violation of a clearly established right, the government official is

18   entitled to qualified immunity if he could have "reasonably but mistakenly believed that his . . .

19   conduct did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir.

20   2001); see also Saucier, 533 U.S. at 205.

21           The first two steps in the qualified immunity analysis involve purely legal

22   questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a

23   legal determination based on a prior factual finding as to the government official's conduct.  See

24   Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must

25   view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

26   in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

1        As stated above, unless defendants violated a clearly established right which a

2   reasonable person would know, they are entitled to qualified immunity.  Here, the court finds that

3   there was no violation of a constitutional right because Plaintiff was provided all process that

4   was due at his disciplinary hearings and his conclusory allegations regarding threats and the

5   denial of food and showers do not rise to the level of a deprivation that satisfies the objective

6   prong of deliberate indifference in violation of the Eighth Amendment. Therefore, Defendants

7   are entitled to qualified immunity.

8   **IV.  CONCLUSION**

9        As set forth in the discussion above, the court finds no genuine issue as to any

10  material fact exists.  Defendants have met their burden of providing the court with a

11  demonstration of the absence of any genuine issue of material fact.  The burden then shifted to

12  Plaintiff to establish that some factual dispute exists, which he failed to meet.

13       Accordingly, IT IS HEREBY ordered that:

14      1.    Defendants' motion for summary judgment (Doc. 94) is granted; and

15      2.    The Clerk of the Court is directed to enter judgment in favor of

16  Defendants and close this case.

17

18  DATED:  November 15, 2010

19

20  **CRAIG M. KELLISON**
    UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

18